Lance Collins (Bar No. 8246)
Law Office of Lance D. Collins
Post Office Box 782
Makawao, HI 96768
T: 808-243-9292
E: lawyer@maui.net

Bianca Isaki (Bar No. 9977)
Law Office of Bianca Isaki
1720 Huna St. 401B
Honolulu, HI 96817
T: 808-927-5606
E: bianca.isaki@gmail.com

Sitara Witanachchi
Erik Van de Stouwe
(*pro hac vice forthcoming*)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
T: 202-836-9376
E: switanachchi@nrdc.org
E: evandestouwe@nrdc.org

Michelle Wu
(*pro hac vice forthcoming*)
Natural Resources Defense Council
40 West 20th St., 11th Floor
New York, NY 10011
T: 646-889-1489
E: michellewu@nrdc.org

*Attorneys for Plaintiffs (Additional Counsel in Signature Block)*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAII**

FINAFINAU and NATURAL RESOURCES DEFENSE COUNCIL, INC.,

*Plaintiffs*,

v.

MARINE MINERALS ADMINISTRATION; U.S. DEPARTMENT OF THE INTERIOR; MICHAEL OLSEN, in his official capacity as the Acting Director of the Marine Minerals Administration; DOUGLAS BURGUM, in his official capacity as Secretary of the Interior,

*Defendants.*

Civil Action No. 26-592

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Finafinau and the Natural Resources Defense Council bring this civil action against Defendants and allege as follows:

## INTRODUCTION

1. This action challenges the Marine Minerals Administration's November 19, 2026 lease sale for two areas offshore American Samoa for deep-sea mineral mining (PACM-1). With this lease sale, the federal government has rushed to open the ocean floor to commercial mining for the first time, despite its limited understanding of the significant environmental consequences.

2. The deep ocean is the largest yet least understood habitat on Earth, home to biodiverse ecosystems which we have only begun to study. Deep-sea mining is a novel industry that can take several forms. The most well-known is mining polymetallic nodules, which are potato-sized rocks embedded in the seafloor and formed over millions of years. It can also entail mining the massive sulfide deposits formed by seafloor volcanism or the cobalt-rich ferromanganese crusts anchored to the surface of seamounts (or underwater mountains). Commercial-scale deep-sea mining can cause serious and potentially irreversible damage to seafloor ecosystems, generate extensive sediment plumes and toxic discharges, destabilize fisheries and marine food chains, disrupt dark oxygen production and carbon sequestration, and harm marine wildlife.

3. Deep-sea mining threatens the way of life in American Samoa. The Samoan proverb, "*A logo tai, ua logo uta*"—what is felt in the ocean is felt in the land—captures the intertwined relationship between the ocean and Samoan cultural identity, spiritual life, and daily sustenance. Samoans overwhelmingly voiced concerns about mining the deep sea, a relatively unexplored ecosystem whose exploitation could inflict irreparable damage to marine habitats and wildlife, and in turn, the Samoan people. They do not want their waters to be the first testing ground for deep-sea mining. Yet Defendants (collectively, "MMA") neither meaningfully engaged with nor listened to the communities that would bear the bulk of the risks of deep-sea mining while reaping none of its purported benefits.

4. Despite venturing into largely uncharted territory, MMA recklessly accelerated environmental review. In accordance with President Trump's Executive Order directing federal agencies to expedite the permitting process for deep-sea mining projects, MMA is barreling toward the PACM-1 lease sale without sufficient information to comprehensively evaluate the impacts of issuing the first-ever commercial deep-sea mining leases—leaving unanswered Samoans' serious questions about the potential impacts on their coastlines, cultural heritage, well-being, and economy.

5. In its race to the bottom, MMA shortchanged the environmental review process and violated multiple legal requirements. First, MMA failed to

conduct adequate environmental analysis as required by the National Environmental Policy Act (NEPA), the Outer Continental Shelf Lands Act (OCSLA), and the Administrative Procedure Act (APA). Specifically, MMA's decision to hold the lease sale without first preparing an Environmental Impact Statement or considering the environmental effects of exploration, testing, development, and production of deep-sea minerals was arbitrary, capricious, and contrary to NEPA and OCSLA. Second, MMA issued an arbitrary and capricious Finding of No Historic Properties Affected, in violation of the National Historic Preservation Act (NHPA) and the APA, by abdicating its duty to undertake reasonable and good faith efforts to identify historic properties. Third, MMA failed to seek public comment on its Finding of No Historic Properties Affected and thus did not observe the procedures required by the NHPA.

6. Accordingly, Plaintiffs ask this Court to declare that MMA's decision to hold the PACM-1 lease sale violated NEPA, OCSLA, the NHPA, and the APA; to vacate the Final Notice of Sale; and to vacate or enjoin any leases issued or actions taken pursuant to the unlawful lease sale unless and until MMA complies with the law.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 702, 704 (APA).

8. The Final Notice of Sale is a final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.[1]

10. The Court has the authority to grant the requested relief in this case pursuant to 5 U.S.C. § 706 (APA), and 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief).

11. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412 (Equal Access to Justice Act).

**PLAINTIFFS**

12. Plaintiff FINAFINAU is a grassroots youth-centered, membership environmental organization based in American Samoa and grounded in the values of resilience, cultural identity, and intergenerational leadership. Finafinau partners with schools, government agencies, and community organizations, empowering young people to engage in hands-on learning and advocacy to protect American

[1] As indicated in Plaintiffs' Local Rule 40.2 Notice of Related Cases, this case is related to the following cases currently pending in this district: *Fa'asao Amerika Samoa, et al. v. National Marine Fisheries Service, et al.*, 1:26-cv-438-JAO-KJM (filed August 18, 2026) and *Faleula o le Manu'atele, et al. v. Marine Minerals Administration, et al.*, 1:26-cv-543-JAO-KJM (filed October 19, 2026).

Samoa's natural resources. Its work includes coastal restoration efforts, environmental workshops, and other school-based programs to equip American Samoan youth for environmental stewardship. Finafinau's mission includes advocating to protect the ocean's resources, including through community forums, outreach trips, and other advocacy around deep-sea mining.

13. Finafinau brings this action on behalf of its members (including its board members) and supporters, who regularly use, enjoy, and benefit from the waters around American Samoa for cultural, professional, and recreational purposes as well as sustenance. They plan to continue doing so in the future.

14. Finafinau's founder and Executive Director—a board member and member of the organization—is an educator who founded the organization to educate and empower youth to be stewards of the island's marine resources. She leads the organization's grassroots and international advocacy against deep-sea mining. She and her family consume fresh, locally sourced seafood on a regular basis, rely on the ocean and coastlines for respite and enjoyment, and maintain deep cultural connections to the ocean. She has visited Rose Atoll Marine National Monument to observe green sea turtles during nesting season. Deep-sea mining threatens the ecosystem she cherishes and the health of her food supply, harming her professional, cultural, recreational, and subsistence interests.

15. Another board member and member of Finafinau is an educator who

lives in Pago Pago, American Samoa. She leads regular coastal cleanups with students seeking to care for and preserve the habitat of sea turtles, which they look for and regularly observe. She and her family, including her aging mother, rely on the surrounding waters for fresh fish central to their diet and culture. Deep-sea mining threatens sea turtles and risks introducing contaminants into the marine food web, harming the member's professional, cultural, recreational, and subsistence interests in healthy ecosystems and food supply.

16. Plaintiff NATURAL RESOURCES DEFENSE COUNCIL (NRDC) is an international not-for-profit, tax-exempt membership organization incorporated under New York law. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members nationwide, including members who live and work in the Pacific region. NRDC is working to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, and climate change. NRDC's advocacy to protect ocean and coastal ecosystems and wildlife from the harms of extractive activities dates back decades. Science is the foundation of NRDC's work to protect people and the environment. NRDC's members include scientists, and NRDC partners with scientists and regularly conducts, facilitates, and uses scientific research to understand and solve complicated environmental problems and to develop and advocate for evidence-

based policies that protect the natural systems on which people depend. Advancing rigorous scientific study is central to NRDC's mission. NRDC brings this action on behalf of its members, who have professional, recreational, aesthetic, and other interests in areas threatened by the PACM-1 lease sale.

17. One of NRDC's members is a deep-sea marine biologist who focuses on marine ecology, especially the wildlife and ecosystems found on or near Pacific seamounts, including in the ocean around American Samoa. Deep-sea mining operations can introduce toxins and other contaminants into deep-sea ecosystems, and the removal of polymetallic nodules—which form over millions of years—will damage the habitat upon which many species depend. This member is concerned that deep-sea mining could transform and harm the ecosystems he studies, including in American Samoa, before they have been adequately documented and characterized.

**DEFENDANTS**

18. Defendant MARINE MINERALS ADMINISTRATION is the federal agency within the Department of the Interior to which the Secretary has delegated authority under OCSLA to hold mineral lease sales on the Outer Continental Shelf (OCS) and to issue leases.[2] The agency is required to comply with the mandates of

---

[2] In July 2026, the Interior Department merged the Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement into the Marine Minerals Administration. *See* Secretary of the Interior Order No. 3451, Establishment of the Marine

NEPA, OCSLA, and the NHPA.

19. Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal department with authority, through the Secretary, under OCSLA to hold mineral lease sales on the Outer Continental Shelf and to issue leases. The Department is required to comply with the mandates of NEPA, OCSLA, and the NHPA.

20. Defendant DOUGLAS BURGUM is sued in his official capacity as the Secretary of the Interior. He is the chief officer of the Department of the Interior and charged with overseeing the proper administration and implementation of OCSLA. OCSLA vests authority in the Secretary of the Interior to hold mineral lease sales on the Outer Continental Shelf and to issue leases. The Secretary is required to comply with the mandates of NEPA, OCSLA, and the NHPA.

21. Defendant MICHAEL OLSEN is sued in his official capacity as the Acting Director of the Marine Minerals Administration. He is the chief officer of the Administration, the federal agency within the Department of the Interior to which the Secretary has delegated authority under OCSLA to hold mineral lease sales on the Outer Continental Shelf and to issue leases. The Acting Director is required to comply with the mandates of NEPA, OCSLA, and the NHPA.

---

Minerals Administration (July 10, 2026), https://www.doi.gov/sites/default/files/document_secretarys_orders/so-marine-minerals-administration_final_508.pdf. The applicable law and agency documents sometimes refer to BOEM. Plaintiffs use the agency's current name, the Marine Minerals Administration, in this complaint.

## LEGAL BACKGROUND

*The Outer Continental Shelf Lands Act*

22. OCSLA governs the leasing, exploration, and development of oil, gas, and minerals on the Outer Continental Shelf. 43 U.S.C. §§ 1331-1356c.

23. The Outer Continental Shelf extends from the outer boundary of state or territorial waters—typically three nautical miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, typically 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 14, 1983).

24. OCSLA authorizes the Secretary of the Interior to grant "leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf." 43 U.S.C. § 1337(k). Mineral development must be "subject to environmental safeguards." *Id.* § 1332(3).

25. In connection with a lease sale, the Secretary of the Interior shall "conduct a study of any area or region included in any . . . lease in order to establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments of the outer Continental Shelf and the coastal areas which may be affected by . . . mineral development." *Id.* § 1346(a)(1). The required study must be commenced at least six months before holding a lease sale in any area that has not been leased before. *Id.* § 1346(a)(2).

26. The minimum term of a mineral lease is 20 years, and the lease may continue so long as minerals are being produced. 30 C.F.R. § 581.19.

27. After a lease is granted, a lessee may conduct "preliminary activities," which include "bathymetric, geological, geophysical, mapping, and other surveys." *Id.* § 582.21(d). By regulation, preliminary activities are "those which have no significant adverse impact on the natural resources of the OCS." *Id.*

28. A lessee must provide the Secretary with 30 days' notice prior to initiating preliminary activities, *id.* § 582.21(d), but a lessee may not need further agency approval to conduct preliminary activities.

29. A lessee may then submit a plan for "exploration, testing, development, or production activities" for environmental and technical review to the Director of the MMA. *See id.* § 582.21(a)-(b). Upon obtaining the Director's approval, the lessee may proceed. *Id.*

30. "Exploration" refers to "the process of searching for minerals on a lease," including geophysical surveys and drilling. *Id.* § 582.3. "Testing" refers to "removing bulk samples for processing tests and feasibility studies and/or the testing of mining equipment." *Id.* "Development" refers to activities such as drilling, offshore facility construction, and onshore facility operation for the purpose of producing minerals. *Id.* And "production" refers to the mining and production of minerals. *See id.* § 582.24.

31. While a lessee may submit separate plans for exploration, testing, and mining, it is not required to do so: a lessee may submit a mining plan that encompasses proposed exploration and testing activities. *See id.* § 582.21(c).

*The National Environmental Policy Act*

32. Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment;" "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man;" and "enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. NEPA requires a federal agency to consider the environmental consequences of its proposals and actions, including its authorization of private actions. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-51 (1989). NEPA therefore "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* at 349.

33. Under NEPA, all agencies must prepare a "detailed statement" evaluating all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an

Environmental Impact Statement (EIS), must analyze "reasonably foreseeable environmental effects" of the proposed action, "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented," and a "reasonable range of alternatives" that are technically and economically feasible, including a no action alternative. *Id.*

34. If, however, the proposed action "does not have a reasonably foreseeable significant effect on the quality of the human environment" or "the significance of such effect is unknown," the action agency shall instead prepare an Environmental Assessment (EA) in order to determine whether an EIS is warranted. *Id.* § 4336(b)(2).

35. "Effects" of an action refer to "changes to the human environment from the proposed action . . . that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action," including ecological, aesthetic, historic, cultural, social, local custom and culture, or health effects. U.S. Dep't of Interior, 516 DM 1, Handbook of National Environmental Policy Act Implementing Procedures § 6.1(k) (2026) (hereinafter "Interior Handbook"), https://www.doi.gov/media/document/doi-handbook-nepa-procedures. In evaluating significance, an agency should consider short-term and long-term effects, beneficial and adverse effects, effects on public health and safety, economic effects, and effects on quality of life of the American people, including

"[p]assive use of ecosystems" such as "evaluations of stewardship, existence values, and bequest values." *Id.* § 1.2(b)(2); *Id.* App'x 1 at 43.

36. In considering the "potentially affected environment in determining significance," an agency must consider "any connected actions." *Id.* § 1.2(b)(1); *Id.* App'x 1 at 43. A "connected action" includes a "separate Federal action within the authority of the Federal agency that is closely related to the proposed action and should be addressed in a single environmental document because the proposed [] action" "[i]s an interdependent part of a larger Federal action that includes a separate Federal action, which mutually depend on the larger Federal action for their justification." *Id.* § 6.1(g), (g)(3). An agency must also consider "the affected area's natural and cultural resources." *Id.* § 1.2(b)(1).

37. In an environmental assessment, an agency should document "where and how it drew a reasonable and manageable line" in considering environmental effects that "might materialize later in time." *Id.* § 1.5(c)(2).

*The National Historic Preservation Act*

38. The NHPA makes it "the policy of the Federal Government" to "contribute to the preservation of nonfederally owned historic property" and "administer federally owned, administered or controlled historic property in a spirit of stewardship for the inspiration and benefit of present and future generations." 54 U.S.C. § 300101(3)-(4).

39. Section 106 of the NHPA thus requires federal agencies to "take into account the effect of [an] undertaking on any historic property." *Id.* § 306108.

40. The NHPA defines historic property as "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register [of Historic Places], including artifacts, records, and material remains." *Id.* § 300308. "Traditional Cultural Places," such as "landscape or geographic feature[s]" that carry "significance to a living community because of [their] association with cultural beliefs, customs, or practices that are rooted in the community's history and that are important in maintaining the community's cultural identity," can be historic properties. *Tohono O'odham Nation v. U.S. Dep't of the Interior*, 138 F.4th 1189, 1194 (9th Cir. 2025) (citation omitted).

41. Agencies "must make a reasonable and good faith effort to identify historic properties." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (citing 36 C.F.R. § 800.4(b)). This effort "may include background research, consultation, oral history interviews, sample field investigation, and field survey." 36 C.F.R. § 800.4(b)(1).

42. In the leasing context, agencies must attempt to determine whether certain lease areas are or are not culturally significant before issuing leases. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006). Agencies cannot avoid identifying historic properties and consulting affected communities

by relying on lease stipulations. *See Mont. Wilderness Ass'n v. Fry*, 310 F.Supp.2d 1127, 1152-53 (D. Mont. 2004).

43. "The views of the public are essential to informed Federal decisionmaking in the section 106 process." 36 C.F.R. § 800.2(d)(1). By regulation, agencies must "seek and consider the views of the public in a manner that reflects the nature and complexity of [an] undertaking" and "the likely interest of the public in the effects on historic properties." *Id*. Thus, when identifying historic properties, agencies must solicit information from "individuals and organizations likely to have knowledge of . . . historic properties in the area." *Id.* § 800.4(a)(3). Furthermore, agencies must "seek public comment and input" on "an undertaking and its effects on historic properties." *Id.* § 800.2(d)(2).

*The Administrative Procedure Act*

44. The APA confers a right of judicial review on any person who is adversely affected by an agency action. 5 U.S.C. § 702.

45. Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). A reviewing court shall also "hold unlawful and set aside" any agency action promulgated "without observance of procedure required by law." *Id.* § 706(2)(D).

## FACTUAL BACKGROUND

### I. The waters around American Samoa nourish families, sustain cultural traditions, and support vibrant ecosystems

46. For the people of American Samoa, the ocean is revered, ancestral, and inextricably intertwined with their history and cultural identity. The ocean surrounds Samoans. It provides sustenance, supports livelihoods, and sustains cultural traditions. Many Samoans rely on subsistence fishing, while many more rely on locally caught fish for sustenance. The island's tuna cannery is a key employer and economic driver. The island's cultural traditions include the sacred communal harvesting of two marine species, the *akule* (a fish) and the *palolo* (coral sea worms). Samoans' enduring connection to the ocean's welfare is aptly reflected in their proverb, "*A logo tai, ua logo uta*"—what is felt in the ocean is felt in the land.

47. Because the ocean is central to Samoans' way of life, they consider ocean stewardship and protection to be a collective and intergenerational responsibility. Deep-sea mining poses an existential threat to this way of life.

48. The rich waters around American Samoa are also home to endangered and threatened species. These include five species of sea turtles (central South Pacific green turtle, hawksbill turtle, leatherback turtle, South Pacific loggerhead turtle, and olive ridley turtle), four species of whales (blue whale, fin whale, sei whale, and sperm whale), the Indo-West Pacific scalloped hammerhead shark, the

oceanic whitetip shark, the giant manta ray, the chambered nautilus, and five species of corals.

49. Rose Atoll, the easternmost Samoan island that the leasing area abuts, is one of the world's most pristine atolls and features exceptional biodiversity. It is home to 272 species of reef fish, seven of which were first discovered in its waters. Many species live in abundance in the atoll, including giant clams, large parrotfishes, Maori wrasse, and blacktip, whitetip, and gray reef sharks. Species like humpback whales, pilot whales, and porpoises have also been spotted at Rose Atoll. Furthermore, Rose Atoll is one of the few remaining refuges for seabirds and turtles—including the threatened green turtle and the endangered hawksbill turtle—in the Central Pacific. To protect this critical ecosystem, the federal government created the Rose Atoll Marine National Monument in 2009 and included it within the National Marine Sanctuary of American Samoa in 2014.

50. The deep ocean—Earth's largest ecosystem—is home to rich and abundant biodiversity. An astonishing diversity of macro- and microscopic life thrives near the seafloor, known as the benthic zone. Scientists have identified more than 5,000 new marine species in deep-sea environments since 2001, and they continue to discover many new species. High benthic biodiversity is crucial to key ecosystem services, including nutrient cycling, energy production without sunlight, carbon sequestration, and provisioning of medicinal resources.

## II. Deep-sea mining will harm marine ecosystems

51. Deep-sea mining entails the removal of mineral substrate from the seafloor. All extant operations involve an underwater collector, a mineral lifting system, and a surface platform. Operations may differ, however, depending on the technology used and the minerals targeted. For instance, polymetallic nodules can be collected using a mechanical collection device involving a rotary chain-toothed mining head to dredge nodules from the seabed, or a hydraulic collection device that uses high-pressure water jets to dislodge the nodules. By contrast, massive sulfides are generally extracted using cutting machines or excavation equipment. And cobalt-rich crusts are typically mined using spiral roller excavation devices to separate them from the bedrock.

52. Despite their differences, these technologies all entail certain environmental effects.

a. The collection of minerals will generate sediment plumes on the seafloor. As minerals are transported to the surface, sediment will spread throughout the water column. The separation of the mineral product from waste, which involves the dewatering of mineral slurry onboard a vessel, will further discharge waste sediment into the water column. Sediment from these processes may contain heavy metals, which could be introduced into the food web. Fine suspended

sediment near the seafloor can clog the delicate filter-feeding structures and respiratory surfaces of seafloor species, such as glass sponges. Higher in the water column, sediment plume particles dilute the food supply with low-quality mud, forcing particle-feeding zooplankton to consume nutritionally deficient material. Sediment plumes also obscure sunlight, mask bioluminescent signals, and interfere with predation.

b. Removing nodules or other mineral substrate from the seafloor will permanently diminish the habitat for myriad species, many of which have yet to be discovered, let alone studied. Polymetallic nodules have extremely slow growth rates of only a few millimeters to centimeters per million years, and they provide essential anchor points and hard habitat for a specialized community of organisms that permanently attach and do not move on their own, including stalked glass sponges, soft corals, anemones, and stalked barnacles. Such nodule-attached organisms, in turn, are critical food resources for other species, including bottom-dwelling fish and crustaceans. Finally, research indicates that nodules play a role in oxygen production, deep-ocean chemistry, and carbon storage that is not yet fully understood. Because nodules form over millions of years, the ecological, climate,

and biochemical effects of nodule removal would compound across geological time scales.

c. Exacerbating the damage from sedimentation and substrate removal, collector vehicles themselves can result in significant and long-lasting habitat loss. Collector vehicles crush, scrape, and destroy living structures, thus depriving myriad benthic species of habitat, disrupting food webs, and causing long-term biodiversity loss.

d. Increased vessel traffic will also likely have significant environmental impacts, including air and water pollution and increased risk of vessels striking marine mammals, sea turtles, and other species.

e. Noise and light pollution from continuous mining will also degrade the quality of the marine environment. Around-the-clock production platforms on the surface create continuous artificial light at night which can perilously disorient seabirds. Surface platforms attract schools of fish, and their lights attract prey species. When this light penetrates the upper water column, it can also disrupt the daily vertical migration of plankton and other prey species. Such disruptions to the behavior of prey species can alter foraging behaviors and habitat utilization for the myriad species dependent on

them. Mining is also expected to generate noise throughout the entire water column, from vehicles and mining tools on the seabed, to pumps along the riser pipes, to production and support vessels on the surface. Many marine species rely on sound for communication, navigation, foraging, and predator avoidance. Noise pollution can disrupt these vital behaviors.

53. Environmental impacts are not limited to the mining stage. Preliminary activities can also threaten marine ecosystems. For example, High-Resolution Geophysical surveys alter the behavior of whales and dolphins through the powerful acoustic signals used by multibeam echosounder sonar. Preliminary exploratory activities may also introduce marine debris into pristine environments and expose benthic habitats to significant seafloor disturbances. As described above, increased vessel traffic, noise pollution, and light pollution pose risks as well.

54. Given the magnitude of the risks of deep-sea mining, American Samoa has unsurprisingly prohibited deep-sea mining in its waters, along with Hawaii, California, Guam, Oregon, and Washington. These prohibitions are consistent with international skepticism of the industry: 46 countries, over 1,000 scientists, 75 business and financial institutions, and numerous local representatives and Indigenous leaders all support a moratorium or ban on deep-sea

mining in international waters.

55. Despite this groundswell of opposition, the Trump Administration is rushing headlong toward opening domestic and international waters to this novel and untested industry. Executive Order 14,285 directs the Secretary of the Interior to establish an "expedited process" for granting mineral leases. Exec. Order No. 14285 § 3(a)(1), 90 Fed. Reg. 17735, 17736 (Apr. 29, 2025).

### III. MMA will hold the first deep-sea mining lease sale offshore American Samoa

56. On November 19, 2026, MMA will hold a deep-sea mining lease sale for two areas offshore American Samoa. *See* 91 Fed. Reg. 66352 (Oct. 20, 2026).

57. If sold, these would be the first commercial deep-sea mining leases ever issued by the federal government.

58. On June 16, 2025, MMA published a "Request for Information and Interest" (RFI) for a potential mineral lease sale in an area offshore American Samoa. 90 Fed. Reg. 25369 (June 16, 2025). MMA described the "RFI Area" as approximately 18.1 million acres "located near the eastern limit of the American Samoa [Outer Continental Shelf] bordering the Cook Islands Exclusive Economic Zone, northeast of the Manu'a [sic] Islands and Rose Atoll (roughly 70 nautical miles northeast of Rose Atoll)." *Id.* at 25371.

59. MMA received over 76,000 comments in response to the RFI—an overwhelming majority of which explained why MMA should not proceed with

leasing. This included unified opposition to the continued lease process from American Samoa's elected leaders and the American Samoa Legislature's resolution opposing MMA's leasing process.

60. Despite this overwhelming opposition, on November 20, 2025, MMA announced an "Area ID" that nearly doubled the size of the proposed leasing area to over 33 million acres.

61. On July 17, 2026, MMA published the Notice of Availability of the Proposed Leasing Notice for American Samoa Outer Continental Shelf (OCS) Pacific Mineral Lease Sale 1 (PACM-1). 91 Fed. Reg. 44870 (Jul. 17, 2026).

62. In July 2026, MMA also published an Environmental Assessment (EA) and supporting documents, without offering a public notice-and-comment period.

63. On October 20, 2026, MMA published the Final Leasing Notice for PACM-1. 91 Fed. Reg. 66352 (Oct. 20, 2026). MMA will sell two leases spanning a combined area of about 31.5 million acres, as delineated in the figure below:




64. On October 14, 2026, MMA also signed a "Finding of No Significant Impact," concluding based on the EA and supporting documents that the preliminary activities following lease issuance would not result in significant impacts or constitute a major federal action requiring preparation of an EIS.

### A. MMA's Inadequate Environmental Assessment

65. The EA states that the "need" for the lease sale is "to provide access to marine minerals that could potentially be an important and underutilized domestic source" "[t]o help meet the U.S. demand while reducing reliance on imports." EA 2. The proposed sale "aims to facilitate the potential exploration and development" of those minerals. *Id.* at 1.

66. The EA does not include any evaluation of impacts from exploration, testing, development, mining, or production on the leases. The EA evaluates only the impacts of preliminary activities.

67. The EA repeatedly recognizes that baseline environmental data about the affected marine habitats is lacking.

68. For example, seamounts are underwater mountains, typically formed from extinct volcanoes, that rise over 1,000 meters above the seafloor. Seamounts are biodiversity hotspots where species like tuna and marine mammals gather, and which support unique seafloor communities like deep-sea corals. As the EA acknowledges, seamount ecosystems within the American Samoa Exclusive Economic Zone "remain poorly characterized" "[d]espite their importance," and "baseline data collection is needed to assess biodiversity, connectivity, and potential sensitivity to anthropogenic stressors." *Id.* at 27.

69. In the EA, MMA recognized that "the persistence and sensitivity of deep-sea communities warrant careful consideration." *Id.* at 32. It admitted that its environmental analysis "highlights data gaps, particularly in the deeper zones of the Action Area, where biodiversity, ecological function, and baseline conditions remain poorly characterized." *Id.*

70. What's more, the EA's analysis of preliminary activities is itself deficient. Among the preliminary activities contemplated in the EA following the

lease sale is the use of High-Resolution Geophysical surveys to map the seafloor, including multibeam echosounder equipment. Rather than analyze the full range of acoustic effects on wildlife from the use of such equipment, MMA endorsed the Operational National Mitigation Protocol for geophysical surveys, which categorizes these effects as *de minimis*. MMA adopted this characterization without soliciting public comment. But the Protocol's characterization of these effects is predicated on a 160 dB re 1 μPa (underwater decibels) threshold for the take of marine mammals that is not supported by the evidence.

71. On the basis of this abbreviated EA, MMA signed a Finding of No Significant Impact. The Finding incorporates and repeats the errors of the EA.

### B. MMA's Defective NHPA Finding of No Historic Properties Affected

72. MMA issued a "Finding of No Historic Properties Affected" for the issuance of commercial mining leases offshore American Samoa.

73. After evaluating "existing databases, reports, and regional studies" and consulting "with the American Samoa Historic Preservation Officer and consulting parties," EA 67, MMA concluded that "there are no identified historic properties in the" leasing area, EA App'x F at F-12.

74. However, MMA noted that the leasing area "has not been subject to a complete and comprehensive archaeological identification survey," *id.* App'x F at F-9, and thus may contain unidentified "submerged historic sites, consisting of

shipwrecks, downed aircraft, or other cultural resources," *id.* App'x F at F-12.

75. Given this uncertainty, MMA said it would impose leasing stipulations and best management practices (BMPs) on lessees. Specifically, MMA would require lessees to avoid known or potential historic properties, follow "unanticipated discovery protocols" if they identify or discover historic properties, and enlist a qualified marine archaeologist to examine samples and imagery. *Id.* MMA would also require lessees to conduct an archeological survey before submitting further plans.

76. In its Section 106 analysis, MMA acknowledged the ocean's "deep cultural significance" to Pacific Islanders and explained that "through consultation [it] may determine if these lease areas or certain portions are or are not culturally significant to specific communities." *Id.* App'x F at F-11.

77. Yet MMA only attempted to consult one non-governmental organization, the American Samoa Community College, about the draft Finding of No Historic Properties Affected ("the Draft Finding"). That organization ultimately declined MMA's offer to consult.

78. On information and belief, MMA did not adequately attempt to "determine"—through consultation or other avenues—"if [] lease areas or certain portions are or are not culturally significant," *id.*, and thus may qualify as Traditional Cultural Places, before deciding which areas to offer for lease. MMA

also imposed no measures aimed at protecting culturally significant wildlife or their habitat pursuant to its Section 106 authority.

79. MMA shared the Draft Finding with consulting parties for a 30-day comment period. Although MMA published the Draft Finding on its webpage "to seek public comment," *id.* App'x F at F-8, MMA did not specify the date of publication, the length of the comment period, the measures it took to publicize the comment opportunity, nor the mechanism for submitting public comment. The only response MMA reported receiving to the Draft Finding came from a consulting party.

80. Despite acknowledging that the leasing area may contain historic properties, MMA issued its Finding of No Historic Properties Affected. MMA based its conclusion on the stipulations and BMPs imposed on lessees and its determination that preliminary activities "have minimal potential to adversely affect a historic property, if present." EA 69. MMA recognized, however, that impacts associated "with ongoing and reasonably foreseeable planned actions" "may result" in impacts to marine cultural resources, and if such resources cannot be avoided, "the overall effect would be large, and the resource is not expected [to] be recoverable." *Id.*

## FIRST CLAIM FOR RELIEF

### Violation of NEPA, OCSLA, and APA: Inadequate Environmental Analysis and Failure to Prepare an Environmental Impact Statement

81. Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs.

82. NEPA requires an agency to assess the reasonably foreseeable effects of a proposed agency action and prepare an EIS if those effects are significant. *See* 42 U.S.C. §§ 4332(C), 4336(b).

83. OCSLA also requires an agency to prepare an environmental study to "establish information needed for assessment and management of environmental impacts" on areas that "may be affected by . . . mineral development," 43 U.S.C. § 1346(a)(1)-(2), which requires preparation of an EIS at the lease sale stage, *see Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984).

84. MMA recognized in its "purpose and need" statement that the lease sale "aims to facilitate the potential exploration and development" of minerals to procure a domestic source of such minerals. EA 1-2. MMA repeatedly recognized that it lacks adequate baseline environmental information, particularly about the deep-sea ecosystems from which minerals would be extracted.

85. The exploration, testing, and development of deep-sea minerals are "reasonably foreseeable environmental effects" of the mineral lease sale. 42 U.S.C. § 4332(C)(i). Alternatively, the exploration, testing, and development of deep-sea

minerals are "connected actions" to the lease sale that are "interdependent part[s]" of a larger federal action. *See* Interior Handbook §§ 1.2(b)(1), 6.1(g), (g)(3).

86. Despite these statutory mandates, the "purpose and need" of the lease sale, and the lack of baseline environmental information, MMA circumscribed its environmental analysis to the preliminary activities immediately authorized by the lease sale. MMA did not analyze the potential impacts of exploration, testing, and development or prepare an EIS.

87. In addition, in analyzing the effects of the lease sale, MMA failed to adequately consider cultural resources and effects on the quality of life of the Samoan people, including harms rooted in Samoans' stewardship of the ocean.

88. Accordingly, MMA's environmental analysis, and its subsequent Finding of No Significant Impact and failure to prepare an EIS, was arbitrary, capricious, and contrary to law in violation of NEPA and OCSLA. 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Violation of NHPA and APA: Failure to Make Reasonable and Good Faith Effort to Identify Historic Properties

89. Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs.

90. NHPA Section 106 required MMA to "make a reasonable and good faith effort" to identify historic properties that may be adversely affected by federal

undertakings prior to approving them. 36 C.F.R. §§ 800.4(b)(1), 800.1(c). This effort includes soliciting information from "individuals and organizations likely to have knowledge of . . . historic properties in the area." *Id.* § 800.4(a)(3).

91. Issuing marine minerals commercial leases on the OCS offshore American Samoa is a federal undertaking subject to NHPA Section 106.

92. MMA did not engage in reasonable and good faith efforts to identify historic properties in the leasing area.

93. Despite acknowledging the ocean's "deep cultural significance" to Pacific Islanders and that consultation would allow MMA to "determine if [the] lease areas or certain portions are or are not culturally significant to specific communities," EA App'x F at F-11, MMA did not undertake that consultation or otherwise sufficiently solicit information from the public to make that determination *before* deciding which areas to offer for lease. MMA only attempted to consult one non-governmental entity—unsuccessfully. MMA thus issued its Finding of No Historic Properties Affected without consulting any non-governmental community organizations or members.

94. Further, MMA impermissibly relied on lease stipulations and BMPs to avoid identifying historic properties before the lease sale, despite recognizing that such properties may exist and that disturbed resources may not be recoverable. MMA envisioned leasing PACM-1 first and later requiring lessees to perform

archaeological surveys to identify historic properties. But MMA could not shift its duty to identify potential historic properties prior to the lease sale onto lessees via lease stipulations and BMPs.

95. For the foregoing reasons, MMA's Finding of No Historic Properties Affected was arbitrary, capricious, and not in accordance with NHPA Section 106 and its regulations. 5 U.S.C. § 706(2)(A), (D).

**THIRD CLAIM FOR RELIEF**

**Violation of NHPA and APA: Failure to Afford Adequate Public Comment**

96. Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs.

97. NHPA Section 106 required MMA to "seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties" and "the likely interest of the public in the effects on historic properties." 36 C.F.R. § 800.2(d)(1). MMA was also required to "provide the public with information about [the] undertaking and its effects on historic properties and seek public comment and input." *Id.* § 800.2(d)(2).

98. The nature and complexity of the PACM-1 lease sale required MMA to provide a meaningful public comment opportunity, particularly considering that deep-sea mining is unprecedented and that public interest in the leasing action is high. MMA acknowledged its uncertainty about the effects of preliminary

activities on the leasing areas. MMA's failure to make a reasonable and good faith effort to identify historic properties in consultation with Pacific Islanders, *supra*, further heightened the need for public comment.

99. Yet MMA failed to provide the public with an adequate opportunity to comment, including on its Finding of No Historic Properties Affected. MMA claimed it posted the Draft Finding on its webpage to seek public comment, but MMA did not indicate the date of publication, the length of the comment period, the measures taken to publicize the comment opportunity, or the mechanism offered to provide public comment. Indeed, MMA only noted receiving input from governmental entities privy to separate consultation.

100. For the foregoing reasons, MMA's failure to seek public comment was without observance of procedure required by NHPA Section 106 and its regulations. 5 U.S.C. § 706(2)(D).

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs request that the Court:

1. Declare that the Final Leasing Notice violates NEPA, OCSLA, the NHPA, and the APA;

2. Vacate the Final Leasing Notice for PACM-1;

3. Vacate or enjoin any leases executed pursuant to the unlawful lease sale and any activity on leases executed pursuant to the lease sale;

4. Issue any other appropriate injunctive relief;

5. Award Plaintiffs fees and costs pursuant to 28 U.S.C. § 2412 to the extent permitted by law; and

6. Grant such other relief as the Court deems just and proper.

Dated: November 18, 2026

Respectfully submitted,

/s/ Lance Collins
Lance Collins (Bar No. 8246)
Law Office of Lance D. Collins
Post Office Box 782
Makawao, HI 96768
T: 808-243-9292
E: lawyer@maui.net

Bianca Isaki (Bar No. 9977)
Law Office of Bianca Isaki
1720 Huna St. 401B
Honolulu, HI 96817
T: 808-927-5606
E: bianca.isaki@gmail.com

Michelle Wu
(*pro hac vice forthcoming*)
Natural Resources Defense Council
40 West 20th St., 11th Floor
New York, NY 10011
T: 646.889.1489
E: michellewu@nrdc.org

Sitara Witanachchi
Erik Van de Stouwe
(*pro hac vice forthcoming*)

Natural Resources Defense Council
1152 15th St NW, Suite 300
Washington, DC 20005
T: 202-836-9376
E: switanachchi@nrdc.org
E: evandestouwe@nrdc.org

Alice Viera
(*pro hac vice forthcoming*)
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
T: 415-875-8248
E: aviera@nrdc.org

*Attorneys for Plaintiffs Finafinau and Natural Resources Defense Council*